**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MAHER SOLIMAN,<br><br>　　　　　　*Plaintiff*,<br><br>　　v.<br><br>JOHN F. KERRY, *Secretary of State*,<br><br>　　　　　　*Defendant*. | Civil Action No. 13-140 (RDM) |

## MEMORANDUM OPINION

Maher Soliman was briefly employed by the State Department as a legal advisor during the reconstruction of Iraq.  He was terminated five months after he began work for the Department, however, and when he subsequently applied for another position, he was not selected.  Soliman brought an administrative complaint against the Department, alleging that he was terminated on the basis of his national origin and subsequently denied re-employment on the basis of his original complaint.  When his administrative complaint was denied, Soliman brought this action under Title VII of the Civil Rights Act of 1964.  The matter is now before the Court on the parties' cross-motions for summary judgment.  For the following reasons, the Court **GRANTS** the Department's motion for summary judgment and **DENIES** Soliman's motion for summary judgment.

## I.  BACKGROUND

### A.    Pre-Termination

Maher Soliman is a U.S. citizen of Egyptian descent.  Dkt. 1 at 4 (Compl. ¶ 10).  In May 2009, he began working for the State Department's Iraq Transition Authority Office, based in Iraq, as a "Rule of Law Senior Advisor."  Dkt. 24-2 at 35 (Report of Investigation ("ROI") 34).

Soliman was appointed under 5 U.S.C. § 3161, which permits certain government entities to hire employees on a temporary basis of up to three years. *Id.* Soliman's appointment was not to exceed 13 months. *Id.* The job description for Soliman's position stated that "the [Provisional Reconstruction Team ("PRT")] Rule of Law Senior Advisor is responsible for providing advice and assistance to provincial entities in the development, implementation, and coordination of rule of law initiatives." *Id.* at 26 (ROI 25). It listed a J.D. degree and "Arabic or Kurdish language capability" as preferred qualifications. *Id.* at 28 (ROI 27). And it stated that the Senior Advisor would "report[] directly to a [PRT] Team Leader" in Iraq. *Id.* at 26–27 (ROI 25–26).

Soliman was initially assigned to the Salah ad Din PRT, headquartered near Tikrit. Dkt. 24 at 45 (Pl.'s Statement of Material Facts ("SMF") ¶ 3). But he was almost immediately sent to work in the PRT's satellite office in Samarra. *Id.* (Pl.'s SMF ¶ 4). What happened in Samarra is disputed. Mike Craft, who worked closely with Soliman in Samarra, later told an investigator that there had been "management difficulties related to cultural insensitivity that put the mission at risk"—that is, that Soliman had said or done things that Iraqis found offensive. *See* Dkt. 24-2 at 152 (ROI 151); *see also* Dkt. 27 at 46–48, 51 (Second Soliman Decl., Exs. B, E) (memos to file allegedly written by Craft to document incidents with Soliman). Soliman denies that these incidents took place, but told an investigator that he sent an e-mail to Craft that "implicated" him in an alleged kickback scheme that occurred "prior to [Soliman's] arrival in Samarra." Dkt. 24-2 at 110 (ROI 109). After Soliman told Craft that he intended to conduct an investigation into the claims, Craft purportedly removed the investigative file from Soliman's office and instructed Soliman to refrain from any further investigation of the matter. *Id.*

Regardless of the reason, when Soliman returned from a previously scheduled leave at the end of September 2009, he was reassigned from Samarra to the PRT's headquarters at Salah

ad Din.  *See* Dkt. 24 at 45 (Pl.'s SMF ¶ 5).  Because David Stewart, the PRT Team Leader, was

on leave, Craft directed Soliman not to perform legal work, but instead to await further

instructions regarding his role at the PRT.  Dkt. 24-2 at 111 (ROI 110).  In late October 2009,

Soliman sent an e-mail to the members of the PRT summarizing and analyzing "a key electoral

law" pending before the Iraqi parliament.  *See id.* at 260 (ROI 258).  Soliman signed the e-mail

"Senior Rule of Law Advisor-PRT."  *Id.*  Timothy Funnell, the PRT team member who had been

overseeing rule-of-law work in Salah ad Din, replied to ask Soliman to "drop 'Senior' from [his]

title," as it was "misleading as to [Salah ad Din] PRT Rule of Law section leadership."  *Id.*

Soliman wrote back, stating that "Senior Rule of Law Advisor" was "the position that [he] was

hired to do" and attaching the position description.  *Id.* at 261 (ROI 259).  Funnell replied and

told him there was "no need to change the signature line."  *Id.*

On November 1, 2009, when Stewart returned from leave, Soliman sent him an e-mail

asking for clarification about his role on the PRT.  Dkt. 24-2 at 281 (ROI 280).  Soliman asserted

that, in Stewart's absence, he had been "prevented from doing the duties that [he] was hired to do

as Section-Lead."  *Id.* at 282 (ROI 281).  Soliman wrote: "Although I am ready, willing and able

to help others, as Section-Lead I should ONLY be reporting to you."  *Id.*  Soliman explained that

he had "applied, trained and was appointed the position as Rule of Law Senior Advisor-Section

Lead," and wrote:

> [S]o why can't I be given the position that I applied and was hired to do and why
> do I have to report to Brett and Barbara if I was told to report JUST TO THE
> TEAM LEADER (yourself)?[]  Indeed, previously, Mike positioned himself as
> my superior without justification, however, I declined to raise the issue for better
> work relationship in Samarra.  I think time has come that all PRT team members
> understand that you are the ONLY one who is my boss in Sala Ad Din PRT.

*Id.*

3

Soliman's e-mail appears to have precipitated an internal discussion regarding his role on the PRT. Stewart forwarded the e-mail to other PRT members along with a proposal to address concerns about Soliman in one of three ways: (1) "direct [Soliman] to his supervisor," another member of the PRT, where "his duties will be to work with" another PRT member on "the daily press summary"; (2) tell him that they "don't need his skills for which he was hired"; or (3) show him that they are "doing what [they] can to create a position for him." *See id.* at 281 (ROI 280). Stewart appears to have ultimately selected the final course of action. Later that day, he wrote to several human resources officials stating that the PRT would "mak[e] the best of this situation" by assigning Soliman to work directly beneath Funnell, who had previously been overseeing rule-of-law work for the PRT. *Id.* at 284 (ROI 283). Specifically, Stewart wrote:

> The PRT, you may recall, pulled Maher Soliman out of our Samarra satellite, due primarily to inappropriate comments he had made to Iraqis that they found inexcusable. The PRT would have been satisfied if he had been deployed elsewhere, but we were directed to accom[m]odate him at PRT Main. We did so, however with the proviso that he not be in contact with Iraqis, as he could destroy relationships that our ROL Advisor has worked so hard to build.
>
> In my absence on R&R, the PRT assigned him temporarily to the Governance section, and have since asked him to do some translating of news stories. And I have had the opportunity to assess his potential to contribute in other ways.
>
> [Salah ad Din] PRT now believes that Maher could become a productive team member, but we need some guidance/clear authority as follows:
>
> 1. We must be able to establish to Maher that SES Assistant U.S. Attorney Tim Funnel, ROL Advisor, is his supervisor. Maher believes that he will be directly working for me, and that is simply not feasible, nor in any way desirable.
>
> 2. Would Tim have the authority to amend Maher's job description to reflect the needs of our ROL program? Tim would be assigning duties between himself, as Lead, a BBA who happens to be an accredited attorney in [Salah ad Din], and U.S.-trained Maher. As [team leader], I believe that Tim needs this flexibility to construct an effective work plan for Maher. We need clarification from HR on this point.
>
> Having Maher back on our team was not our first choice. However, with clarity on the points above, Tim Funnell and I are committed to making the best of this situation.

*Id.*

Soliman, however, resisted Stewart's efforts to alter his assigned role.  On November 19, 2009, Soliman met with Stewart and Funnell, who asked him to sign a document entitled "Maher Soliman operational agreement and work requirements." *Id.* at 328 (ROI 327).  The agreement stated that Soliman "will be directly supervised by, and report to, Mr. Funnell, the RoL section leader." *Id.*  It also stated that Soliman would work on rule-of-law projects at Funnell's "control, direction and supervision," as well as projects for other section leads, "subject to Mr. Funnell's approval." *Id.*  The agreement further stated that the Department could "terminate Mr. Soliman's appointment early for performance reasons, for operational reasons, or on account of his conduct, without notice and without an opportunity to respond." *Id.*  Under the agreement, Soliman was not to exercise any "supervisory rights or responsibilities in the PRT, including the RoL section, except as designated by Mr. Funnell or Mr. Stewart." *Id.*  Soliman rejected the agreement.  Dkt. 24 at 46–47 (Pl.'s SMF ¶ 17).

The following day, Soliman approached Funnell to discuss the agreement.  Dkt. 24-2 at 332 (ROI 331).  Soliman apologized, but proceeded to argue that the agreement was illegal and asked for additional time to consider it. *Id.*  Funnell refused. *Id.*  That evening, Soliman sent an e-mail to two human resources officials that began: "Mr. Stewart has threatened to terminate my employment unless I sign a document which I believe . . . to be illegal." *Id.* at 334 (ROI 333).  He described the events of the prior weeks and stated his belief that Stewart "d[id] not have the legal authority to change" his job description. *Id.*  Soliman also cited the federal obstruction-of-justice statute, 28 U.S.C. § 1512(b), and alluded to the possibility that Stewart and Funnell may have violated the statute by proposing to amend his job description. *Id.* at 334–35 (ROI 333–34).  Stewart then elevated the issue to other Department officials and asked for permission to fire

5

Soliman.  *Id.* at 337–47 (ROI 336–46).  On November 24, 2009, the Department formally

terminated Soliman's § 3161 position "for operational necessity."  *Id.* at 47 (ROI 46).

**B.      Post-Termination**

Soliman initiated Equal Employment Opportunity ("EEO") proceedings in early 2010.

On January 6, 2010, he wrote an e-mail to Dora Hanna, the human resources director for the

Iraqi Transition Assistance Office, who had sent him his formal termination letter.  *Id.* at 129

(ROI 128).  The e-mail was copied to Greta Holtz, the director of the State Department's Office

of Provincial Affairs.  *Id.*  In the e-mail, which was entitled "Grievance // Breach of Contract,"

Soliman alleged that he had been the subject of "blatant discrimination . . . on account of [his]

national origin."  *Id.* at 130 (ROI 129).  He alleged that Stewart had attempted to "demote [him]

for no other reason than to discriminate against [him] . . . on account of [his] national origin" and

that Stewart had terminated him "because [he] refused to be demoted on account of [his] national

origin."  *Id.* at 131 (ROI 130); *see also id.* ("In other words, he decided that since he couldn't

demote me without justification, [he would] lay me off . . . .").  There is no evidence in the

record that Hanna responded to the e-mail, and Holtz states that she does not recall reading it, but

other State Department employees appear to have forwarded it to the relevant EEO officials.  *See*

Dkt. 24-2 at 129 (ROI 128); Dkt. 25-3 at 1–2 (Holtz Decl. ¶ 4).

Around the same time, Soliman began applying for other § 3161 positions at the State

Department.  *See, e.g.*, Dkt 27 at 71 (Supp. Soliman Decl., Ex. P) (acknowledgement dated Dec.

15, 2009).  In March 2010, Soliman apparently applied for another § 3161 position in Iraq.  Dkt.

25-4 at 1–2 (Muller Decl. ¶ 2); Dkt. 27 at 28–29.  On March 10, 2010, Ghassan Hanna, another

PRT employee, wrote two human resources officials at the State Department stating that Soliman

had, "after filing a formal complaint against David Stewart," been "offered his previous position

of [Senior] Rule of Law Advisor." Dkt. 27 at 67 (Supp. Soliman Decl., Ex. M). This e-mail was forwarded to Holtz, who asked one of her employees to "look into [it]." Dkt. 24-2 at 133 (ROI 132). Holtz wrote: "State should never rehire Maher Soliman. I thought we had a mechanism in place so that people we relieved of duty here in Iraq for poor performance or other serious issues would not get re-hired." *Id.* She concluded: "Maybe [Hanna] has incorrect information. I hope so." *Id.* A few months later, Hanna—who was copied on Holtz's e-mail—apparently forwarded a copy to Soliman. *Id.*

Hanna's tip was indeed incorrect: Soliman had not yet been hired. Soliman was told on March 31, 2010, that the State Department had begun reviewing applications for the position in Iraq. Dkt. 24-1 at 27 (Soliman Decl., Ex. N). On April 16, 2010, Soliman was contacted by a State Department employee who asked for professional references and responses to a number of interview questions. *Id.* at 28 (Soliman Decl., Ex. O). According to State Department employee John Muller, however, when the human resources officials reviewed Soliman's application for the position in Iraq, they noticed a discrepancy between his online resume (which described him as a current employee of the State Department) and the resume he submitted as an attachment. *See* Dkt. 25-4 at 3 (Muller Decl. ¶ 6). Muller attests that "[i]n light of the inconsistency between Mr. Soliman's resume and his [formal exit paperwork]," he decided not to forward Soliman's application to the official who would decide whom to hire. *Id.* at 3–4. The position was filled in late May 2010, but Soliman was not notified due to an administrative error. *Id.* at 4 (Muller Decl. ¶ 7). Soliman reached out to Muller's office in June 2010 to complain that he had been rejected due to "false information" in Holtz's March 10, 2010 e-mail, which he forwarded to Muller's office, but Muller replied and explained that he had not been aware of the e-mail until Soliman had forwarded it to his office. *Id.* at 4–5 (Muller Decl. ¶ 9).

While this process was proceeding, Soliman pursued his administrative remedies in the EEO process.  He met with an EEO counselor on March 18, 2010, Dkt. 24-2 at 84 (ROI 83), and then filed a timely administrative complaint on April 27, 2010, alleging that he had been discriminated against on the basis of his national origin, *id.* at 15 (ROI 14).  On May 25, 2010, he amended his administrative complaint to add a charge of retaliation, alleging that the Department had declined to hire him for the Iraq position on the basis of his EEO complaint.  *Id.* at 91 (ROI 90).  A State Department investigator conducted a formal investigation and filed an exhaustive 372-page investigative report on November 8, 2010.  *See generally id.* (ROI).  It appears that Soliman decided to proceed to a hearing before an administrative law judge, who issued an oral decision in favor of the agency on June 28, 2012.  Dkt. 1 at 20–21 (Compl., Ex. A).  Neither the decision nor the transcript of the hearing appear in the record.

Soliman filed this action, proceeding *pro se*, on February 4, 2013.  Dkt. 1.  He brought five counts against the Secretary of State, the State Department, and twenty unnamed individual defendants.  *Id.* at 1.  He alleged that the Department had (1) breached the contract entered into between him and the Department "by terminating [him] without cause or due process," Compl. ¶ 37; (2) discriminated against him on the basis of his national origin by firing him, *id.* ¶ 41; (3) committed the tort of wrongful discharge in violation of public policy by doing so, *id.* ¶ 50; (4) retaliated against him on the basis of his opposition to discriminatory practices by failing to hire him again, *id.* ¶ 59; and (5) retaliated against him on the basis of his EEO complaint and his participation in the EEO investigation, *id.* ¶ 68.  The State Department filed a motion to dismiss, which Judge Amy Berman Jackson granted in part and denied in part in an oral ruling on August 18, 2014.  Aug. 18, 2014 Minute Entry.  Specifically, Judge Jackson dismissed three of the five

counts, leaving only Soliman's claims of national-origin discrimination and retaliation on the basis of his EEO complaint.  *Id.*

The matter is now before the Court on the parties' motions for summary judgment.  Dkts. 24, 25.

## II.  LEGAL STANDARD

Summary judgment is appropriately granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895–96 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the outcome of the litigation.  *Holcomb*, 433 F.3d at 895; *Liberty Lobby*, 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."  Fed. R. Civ. P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  *See Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).  When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir. 2006).  The non-movant's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for

trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-movant must provide evidence that would permit a reasonable jury to find in its favor.  *See Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If his evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  *Liberty Lobby*, 477 U.S. at 249–50.

## III.  DISCUSSION

Two of Soliman's claims remain pending: his claim that he was terminated on the basis of his national origin and his claim that he was subject to retaliation on the basis of his decision to press his discrimination grievance.  The Court evaluates each in turn.

## A.      Discrimination Claim

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Where, as here, the plaintiff lacks direct evidence of discrimination, the Court evaluates Title VII discrimination claims using the burden-shifting framework first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016).  First, the plaintiff must establish a *prima facie* case of racial discrimination.  *Id.*  To do so, he "must allege that [he] is part of a protected class under Title VII, [he] suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination."  *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).  Once he does so, the burden "shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action."  *Wheeler*, 812 F.3d at 1114.  If the employer can do so, the burden then shifts back to the plaintiff, who must demonstrate that the employer's stated reason for its actions was in fact a pretext for unlawful discrimination.  *Walker*, 798 F.3d at 1092.

10

In considering a summary judgment motion where the defendant has offered a legitimate reason for the adverse employment action, however, a court must "skip ahead to the third step in the test." *Wheeler*, 812 F.3d at 1114.  In such a case, "the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (quotation marks and alteration omitted).  "[T]he district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case . . . ." *Id.* at 494 (emphasis in original).  All that remains is the "central question" whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin." *Id.*  Here, because the Department asserts that Soliman was fired for cause, the only relevant inquiry is whether Soliman has produced sufficient evidence for a reasonable jury to find that the Department's asserted nondiscriminatory reason for firing him was not the actual reason and that, instead, the Department intentionally discriminated against him on the basis of his national origin.  *See Wheeler*, 812 F.3d at 1114.

The Department's main argument is that it ended Soliman's employment because of his "insubordination"—that is, because "he refused, contrary to Mr. Stewart's direction," to accept the terms of the November 19, 2009 "operational agreement," under which he would report only to Funnell, not Stewart.  Dkt. 25-1 at 9.  Soliman's burden at this stage is straightforward.  He must show that this reason "was not the actual reason" he was fired, *Brady*, 520 F.3d at 494, and that, instead, the Department "was hiding a true, discriminatory motive," *Walker*, 798 F.3d at 1093.  Much of Soliman's argument, however, does not address this issue; rather, the thrust of his argument is that he was *justified* in refusing to sign the November 19 agreement.  Dkt. 24 at

27–39; Dkt. 27 at 12–20.  But whether Soliman was justified in refusing to sign the agreement is at best tangentially relevant to the "central inquiry" under Title VII whether the Department was actually motivated by Soliman's insubordination (and performance) to fire him or whether, in fact, it was motivated by Soliman's national origin.  As the Court will explain, Soliman has not produced sufficient evidence for a reasonable jury to find that the Department was actually motivated by his national origin in terminating his employment.

Soliman's primary argument, construed liberally, is that Stewart had no basis for asking him to sign the November 19 agreement.  At the outset, however, it is important to distinguish between two strands of this argument.  Soliman's focus is on whether the statutes and contracts that governed his employment in Iraq permitted Stewart to attempt to amend Soliman's job description in the way that he did.  Soliman argues at length that the proposal was "beyond the scope of [Stewart's] authority," Dkt. 24 at 27; that it would have transformed his position at the PRT from that of an employee to that of a contractor, *id.* at 27–28; that it was a "bad faith attempt to make [Soliman] resign . . . in order to[] appease and accommodate [Funnell]," *id.* at 34; that it was "illegal on its face," *id.*; or, at the very least, that Soliman reasonably believed that it was at the time, *id.* at 34–35.  *See also id.* at 36 (listing "legal issues" that include "[w]hether Plaintiff's refusal to sign the proposal that was intended to serve as his resignation constituted a refusal to obey a legal order" and "[w]hether Plaintiff's refusal was reasonable based on his Good Faith Belief it was illegal"); Dkt. 27 at 17–20 (similar).

These arguments, however, are misplaced in a Title VII discrimination suit.  The matters Soliman focuses on—whether Stewart had the authority to change Soliman's job description, whether he was justified in attempting to change Soliman's job description, and whether Soliman was justified in attempting to resist such a change—might be relevant in another context.  These

considerations might be relevant if, for example, Soliman had a basis to file a grievance under the Civil Service Reform Act of 1978 or some other, similar, law and was, in fact, pursuing such a claim. *See* 5 U.S.C. § 7513(a) (limiting adverse employment actions to those taken "for . . . cause"); *id.* § 2302(b)(9)(D) (prohibiting an agency from taking personnel action on the basis of an employee's refusal "to obey an order that would require the individual to violate a law"); *see Kloeckner v. Solis*, 133 S. Ct. 596, 600 (2012). But these questions are not the focus of a Title VII suit. Title VII prohibits only adverse employment actions taken "because of [an employee]'s race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). That is, in a Title VII suit, the critical question is not whether an employer was *authorized* to terminate an employee, but whether the employer was *motivated* to terminate the employee "because of" the employee's protected characteristic.[1]

This is not to say that the *reason* that Stewart and Funnell asked Soliman to sign the November 19 agreement is irrelevant. To the contrary, the D.C. Circuit has long recognized that a Title VII plaintiff may show pretext by "demonstrat[ing] that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision." *See Brady*, 520 F.3d at 495; *see also George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005). If

---

[1] Soliman relies on a line of cases that state that "[a]n erroneous belief that an employer engaged in an unlawful employment practice is reasonable, and thus actionable under [42 U.S.C. § 2000e-3(a)], if premised on a mistake made in good faith." *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994); *see also EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983); *Flait v. N. Am. Watch Corp.*, 3 Cal. App. 4th 467, 476 (1992). But these cases, to the extent they apply Title VII at all, turn on 42 U.S.C. § 2000e-3, which prohibits adverse action taken on the basis of an employee's opposition to *discrimination*, not to illegality writ large. *See* 42 U.S.C. § 2000e-3(a) (prohibiting adverse action against an employee "because he has opposed any practice made an unlawful employment practice *by this subchapter*" (emphasis added)). Soliman can point to no evidence suggesting that he resisted signing the November 19 agreement because he believed it was *discriminatory*—only that he believed it violated the terms and conditions of his federal employment.

Soliman was able to show that a reasonable jury could believe that Stewart did not *actually* ask

Soliman to sign the agreement on the basis of his concerns with Soliman's performance, "the

inference that the real reason was a forbidden one . . . may rationally be drawn." *See Walker*,

798 F.3d at 1093 (quoting *Shager v. Upjohn Co.*, 913 F.2d 398, 401 (7th Cir. 1990)).  But

Soliman's burden is not to show that a jury could find that Stewart's alleged concerns with his

performance were ill-founded; it is to show that Stewart was "making up or lying about" those

concerns in order to mask his discriminatory intent.  *Brady*, 520 F.3d at 495; *see also id.* at 496

("The question is not whether the underlying sexual harassment incident occurred; rather, the

issue is whether *the employer honestly and reasonably believed* that [it] . . . occurred." (emphasis

in original)).  Soliman has not produced sufficient evidence to meet that burden.[2]

Soliman's primary support for his attack on the Department's proffered reason is a series

of e-mails sent by Stewart and others regarding their efforts to document their conversations with

Soliman.  *See* Dkt. 24-2 at 260–365 (ROI 258–364).  Soliman points to several e-mails in this set

that he suggests can be read as evidence that the Department's stated performance-based reasons

were pretextual.  In particular, Soliman argues, three e-mails sent by Stewart to several deputies,

including Funnell, in the 48 hours before Soliman was fired can be read as instructions "to edit[,]

fabricate, invent stories, mislead and falsify counseling statements regarding [Soliman] in order

to[] achieve [Stewart's] goal."  Dkt. 24 at 15.  In the first of these e-mails, Stewart asked Funnell

to obtain "whatever form is needed and produce a counseling statement for our talk with Maher

last Thurs[day]."  Dkt. 24-2 at 295 (ROI 294).  In the same e-mail, Stewart instructed Craft and

---

[2]  Similarly, if Soliman could show that Stewart did not actually seek his termination because he refused to sign the agreement, that might raise a similar inference for the jury.  But Soliman does not genuinely press this point.  That is, he appears to concede that he was fired as a direct result of his refusal to sign the November 19 agreement; he simply argues that Stewart lacked a lawful and appropriate basis for pressing the agreement in the first place.  *See* Dkt. 24 at 13–15.

Major Lance Duellman that they should "[d]ecide what . . . to tell" a State Department official

who had asked if there were "any counseling statements":

> You could say that the conversations took place, Maher doesn't dispute the
> contents. Was there any training on just how to document counseling? Whatever.
> Their technical point will be that we didn't document this CORRECTLY and
> provide a copy to Maher. But make the point, Lance, that we are not bringing up
> the earlier Samarra issue . . . . We are focused on the present, that he does not
> accept his designated supervisor.

*Id.* In a later e-mail, Stewart made a similar point, suggesting that his deputies tell the relevant

Department human resources staff "that the supervisor of Maher did not know from his training

at the Embassy to provide him copies of the counseling sessions." *Id.* at 298 (ROI 297). Other

e-mails are to similar effect. *See, e.g.*, *id.* at 301 (ROI 300).

But none of these e-mails provides any basis to believe that Stewart, or anyone else at the

Department, was "making up or lying about" their concerns with Soliman's performance. *Brady*,

520 F.3d at 495. At most, the e-mails reflect Stewart's anxiety that he had failed adequately to

document those concerns. The D.C. Circuit has emphasized, however, that employers are not

required to "publish a contemporaneous statement of reasons every time they make a hiring or

firing decision," *Jackson v. Gonzales*, 496 F.3d 703, 710 (D.C. Cir. 2007), and they are surely

not required to document every time they have some concern that might one day lead to a hiring

or firing decision. Here, moreover, the record provides ample evidence that Stewart was in fact

concerned about Soliman's performance. One e-mail exchange from two weeks before Soliman

was fired, for instance, makes clear that multiple people, including Stewart, were concerned that

Soliman's e-mails regarding current Iraqi affairs could harm the Department. Dkt. 24-2 at 269–

72 (ROI 267–270) ("The Governor of Salah al-Din MUST GO!!!" (subject line of e-mail from

Soliman)); *see also id.* (e-mail from public affairs official suggesting other PRT member "talk to

Maher about such statements" as they "could be used to embarrass us"). This is not to suggest

15

that Stewart's concerns were well-founded, a question on which the Court expresses no view.  It is not the role of the Court "to serve as a 'super-personnel department that reexamines an entity's business decisions.'"  *Holcomb*, 433 F.3d at 897 (quoting *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999)).  All that matters for present purpose is that there is not enough evidence in the record for a reasonable jury to conclude that such concerns were pretext for discrimination on the basis of Soliman's national origin.

Soliman makes two other attempts to attack the veracity of the Department's concerns, but neither finds sufficient support in the record.  First, he argues that the evidence undermines the Department's assertions that Stewart asked him to sign the November 19 agreement in part because he had offended Iraqis in Samarra.  *See* Dkt. 27 at 11–16.  Soliman argues that several memos (which he attaches to his opposition to the Department's motion for summary judgment, Dkt. 27 at 46–48, 51) allegedly written by Craft are "false," and that various incidents described in the memos could not have happened on the dates described in the Craft memos.[3]  But these discrepancies are largely the kind of "minor variations" insufficient "to make the [proffered] accounts unworthy of belief, let alone support an inference of discrimination."  *Walker*, 798 F.3d

---

[3]  For instance, Soliman asserts that one conversation described in one of the memos, between Craft and several members of Soliman's orientation class, could not have occurred as Craft claimed.  Craft wrote that he met with members of Soliman's orientation class when he made a trip to Baghdad to confer with Soliman in "mid June," before "departing on a 20 day leave," and that these people expressed concerns about Soliman.  *See* Dkt. 27 at 46 (Pl.'s Reply, Ex. B).  But Soliman contends that this conversation could not have taken place, because he met with Craft only once, on June 9, and his orientation did not begin until June 11.  Dkt. 27 at 12.  Even if the memo were relevant, however, Soliman offers no reason to discredit it.  June 9 could reasonably be described as "mid June"; Soliman does not assert that the other members of his orientation class were not in Iraq by June 9; and he does not address Craft's claim that the other members of his class "had been with Mr. Soliman from the start of orientation in Washington," Dkt. 27 at 46 (Pl.'s Reply, Ex. B), and thus presumably could have formed their views based on interactions that occurred before the Iraq orientation had begun.

at 1094.  And, to the extent that Soliman's own evidence regarding the events in Samarra is credited, it also tends to refute an inference of impermissible discrimination: in Soliman's own account, his disagreement with Craft stemmed not from any animus toward people of Egyptian descent, but from Soliman's allegations that Craft was "implicated" in a kick-back scheme.  *See* Dkt. 24-2 at 110 (ROI 109).

Soliman also gestures at an argument that he was treated differently than other members of the PRT—specifically, than Craft, Funnell, and a third employee, Katherine Dennison, who was also a § 3161 appointee.  It is true that "[o]ne way to discredit an employer's justification is to show that similarly situated employees of a different [nationality] received more favorable treatment."  *Wheeler*, 812 F.3d at 1115 (quoting *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008)).  But to prove that the other employee is similarly situated, the plaintiff must "demonstrate that all of the relevant aspects of his employment situation were nearly identical to those of the other employee."  *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (quoting *Holbrook v. Reno*, 197 F.3d 255, 261 (D.C. Cir. 1999)).  The factors relevant to such a determination "include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses."  *Id.*

Here, Soliman has mustered virtually no evidence that Craft, Funnell, or Dennison were similarly situated to him—at least not in the way contemplated by the caselaw.  The lynchpin of an argument regarding comparator evidence is that the putative comparators "were charged with offenses of comparable seriousness," but were let off more lightly.  *Id.*; *see Wheeler*, 812 F.3d at 1115.  But Soliman cannot point to any evidence that any of the three comparators were ever charged with misconduct or insubordination of any kind—or, more broadly, that they engaged in

any course of conduct similar to Soliman's.  *See Burley*, 801 F.3d at 301; *Holbrook*, 196 F.3d at

261.  Even if Soliman could do so, it appears from the record that all three had been working in

Iraq for longer periods of time than Soliman; that they had different duties and responsibilities

than Soliman; and that at least one, Dennison, was not involved in the rule-of-law section where

Soliman worked.  *See Burley*, 801 F.3d at 301–02 (detailing ways in which comparison was

inapt).  Soliman has raised no genuine dispute of material fact about whether these people were

similarly situated.  The record is clear that they were not.

In reviewing the evidence proffered by both parties, the Court is cognizant of its duty to

treat "subjective explanation[s]," including performance-based explanations of the kind that the

Department asserts here, "'with caution.'"  *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1246–47

(D.C. Cir. 2011) (quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1988)

(en banc)).  Nonetheless, having reviewed the record, the Court concludes that there is not

enough evidence for a reasonable jury to find that the Department's proffered explanation for

firing Soliman, even if "subjective," was not its actual reason and that, instead, it discriminated

against him on the basis of his national origin.  Whatever the merits of the Department's reasons,

Soliman has not demonstrated that they were pretext for bias, and, accordingly, he cannot prevail

on his Title VII discrimination claim.

The Court will therefore grant summary judgment to the Department on this claim, and

will dismiss Count II of Soliman's complaint with prejudice.

**B.      Retaliation Claim**

Soliman's remaining claim is that the Department retaliated against him on the basis of

his participation in EEO proceedings when it failed to rehire him in 2010.  Specifically, Soliman

alleges that he applied for a § 3161 position in Iraq in 2010; that Greta Holtz, a former PRT

official in Iraq, e-mailed several Department officials in March 2010 to state that the Department

"should never rehire Maher Soliman"; and that, as a result, he was not hired for the Iraq vacancy.

Dkt. 24 at 41.  He argues that, because Holtz had been copied on an e-mail he sent to initiate the

EEO process in January 2010, her e-mail to other officials in March 2010 should be read as an

effort to retaliate against him for doing so, and that a jury could infer from the fact that he was

not re-hired that Holtz's effort was successful.  *Id.* at 41–42; Dkt. 27 at 29.

Title VII prohibits an employer from retaliating against an employee "because he has

made a charge, testified, assisted, or participated in any manner in an investigation, proceeding,

or hearing under" Title VII.  42 U.S.C. § 2000e-3(a).  A Title VII retaliation claim, like a Title

VII discrimination claim, is subject to the *McDonnell Douglas* burden-shifting framework.  *See*

*Walker*, 798 F.3d at 1091.  And, similarly, where an employer has asserted a legitimate and non-

retaliatory reason for taking adverse action against an employee, courts proceed to the "central

question" at the summary judgment stage: "whether the employee produced sufficient evidence

for a reasonable jury to find that the employer's asserted . . . non-retaliatory reason was not the

actual reason and that the employer intentionally . . . retaliated against the employee."  *Id.* at

1092.

Here, the Department has asserted a legitimate and non-retaliatory reason for not rehiring

Soliman: his application was rejected on its merits.  Dkt. 25-1 at 15–18.  The Department relies

on the declaration of the official who oversaw § 3161 recruiting, John Muller.  *See* Dkt. 25-4 at 1

(Muller Decl. ¶ 2).  Muller attests that Soliman's application for the position in Iraq was not

forwarded to the selecting official because of a discrepancy between the resume he submitted

online (which described him as a current State Department employee) and another statement in

his application (which described him as a former employee).  *Id.* at 3–4 (Muller Decl. ¶ 6).

Although Soliman's retaliation claim is focused on this position, Muller also attests that, with respect to the other § 3161 positions for which Soliman applied in 2010, Soliman's application was not forwarded to the selecting official "either because [his] self-assessment score was too low . . . or because a number of other applicants had higher self-assessment scores." *See* Dkt. 25-4 at 5 (Muller Decl. ¶ 11).

The Department also disputes Soliman's contention that Holtz directed other Department officials not to hire Soliman in 2010 in retaliation for his EEO complaint.  In particular, it points to evidence that (1) Holtz did not read the e-mail Soliman sent her in January 2010, *see* Dkt. 25-3 at 1–2 (Holtz Decl. ¶ 4); (2) Holtz's March 2010 e-mail explicitly stated that Soliman should not be rehired because of his "poor performance" and made no mention of his EEO activity, *see* Dkt. 24-2 at 133 (ROI 132); and (3) Muller and his employees did not read Holtz's March 2010 e-mail until Soliman forwarded it to Muller's office in June 2010, after "the selecting official had already made the selection" for the Iraq position, *see* Dkt. 25-4 at 4–5 (Muller Decl. ¶ 9).  Read as a whole, the Department argues, the record could not lead a reasonable jury to conclude that Soliman was retaliated against on the basis of his participation in EEO proceedings.

In response to this evidence, Soliman submits two copies of his resume that he sent the Department in connection with his application to the § 3161 position, which he says constitute proof that there was no discrepancy between the resumes of the kind Muller describes.  Dkt. 27 at 30; *see id.* at 74–77, 87–91 (Second Soliman Decl., Exs. S-1, V).  And he argues that (1) Holtz's claim that she never read his December 10, 2009 e-mail and (2) Muller's claim that neither he nor his employees ever read Holtz's e-mail are both "false."  *Id.* 27 at 29.  But these arguments fall short of establishing a genuine dispute of material fact regarding the reasons that Soliman was not rehired by the Department.  The fact that Soliman sent accurate copies of his

resume to the Department does not in any way refute Muller's assertion that he sent an inaccurate copy.  And, even if Holtz's recollection is faulty, and she had in fact read the e-mail about Soliman's EEO complaint before she cautioned others in the Department that he should not be rehired, that does not establish a causal connection between the EEO complaint and her e-mail, which was sent two months later—not to mention Soliman's non-selection, which occurred more than three months later.

It is true that the D.C. Circuit has repeatedly stated that evidence that "the *employer* had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity," can "permit an inference of retaliatory motive."  *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) (quoting *Holcomb*, 433 F.3d at 903).  But the fact that such evidence *can* support such an inference does not make it dispositive in every case in which it is introduced—particularly, as here, where the evidence is weak.  Even assuming that Holtz (contrary to her declaration) was aware of Soliman's EEO complaint when she sent her e-mail, there is no evidence to support Soliman's supposition that (contrary to his declaration) Muller saw Holtz's e-mail before the Iraq position was filled.  And the three months that separated Soliman's EEO complaint and Muller's decision not to refer his application to the selecting official is not, standing alone, the kind of temporal proximity that would permit a jury to overcome the weight of the evidence in this matter that there was no causal connection between the two events.  Even if it were, Holtz's e-mail argues that Soliman—like anyone else "relieved of duty here in Iraq for poor performance or other serious issues," Dkt. 24-2 at 133 (ROI 132)—should not be rehired.  Far from revealing retaliatory intent, the e-mail reveals Holtz's legitimate concern that employees terminated for cause should not be re-hired.  Indeed, it would be

surprising for an agency to terminate an employee for cause, only to rehire that employee to the same or similar position within a matter of months with no obvious change in circumstances.

At the summary judgment stage, Soliman's burden is not merely to state that some fact relied upon by the moving party is inaccurate, but to provide evidence that would permit a reasonable jury to reach that conclusion. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324. Soliman has not met that burden. Accordingly, the Court will grant summary judgment to the Department on Count V of Soliman's compliant and dismiss that count with prejudice.

## CONCLUSION

For these reasons, the Court will grant the Department's motion for summary judgment and deny Soliman's motion for summary judgment. A separate Order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: March 29, 2016